THE PEOPLE OF THE STATE OF NEW YORK ex rel. JOSEPH THOMAS STRACCI, Appellant, v WARDEN OF THE NEW YORK CITY HOUSE OF DETENTION FOR MEN et al., Respondents.

First Department, February 7, 1980

### APPEARANCES OF COUNSEL

*Marsha Tanenberg* of counsel (*William E. Hellerstein* and *Donald H. Zuckerman,* attorneys), for appellant.

*Burton Herman* of counsel (*Gerald J. Ryan* with him on the brief; *Robert Abrams, Attorney-General,* attorney), for respondents.

### OPINION OF THE COURT

FEIN, J.

This is an appeal from the dismissal of petitioner's application for a writ of habeas corpus releasing petitioner from the custody of the Warden of the Men's House of Detention.

Petitioner was sentenced to 10 to 20 years imprisonment in 1958 upon conviction for third degree robbery in Queens. He was released on parole on September 14, 1971. During the next three years he reported regularly to his parole officer, but in late 1974 he sought permission to relocate to another

State in order to facilitate finding a better job. This would entail transferring parole supervision to that other State. Permission was denied.

The Parole Board subsequently determined petitioner to be delinquent for leaving his approved residence on or about January 5, 1975, and for failing to report as scheduled on January 7. Investigative report by the Parole Board indicated that petitioner's uncle had been arrested by the New York City police for a series of liquor and clothing store robberies. There was a question whether petitioner was implicated in some of those robberies. A fugitive warrant and also a robbery warrant were apparently issued for petitioner's arrest, but by this time he had absconded to Florida where he took up residence under an assumed name.

In the summer of 1976 petitioner was arrested in Florida on a charge of possession of pills. That charge was later dropped, but as a result of his detention it was learned through routine identity checks that there were outstanding New York fugitive and robbery warrants for petitioner in Queens County. Dade County authorities held petitioner in custody, but released him after 90 days when no extradition request from New York was forthcoming, although the New York police had been advised of his detention.

Three years later, Sergeant Blake of the Dade County Public Safety Department summarized the events of 1976 in a letter to petitioner's Legal Aid attorney: "A detective attempted to check on [petitioner's] status and was informed that [petitioner] had not been extradited because of the expenses involved, the amount of time [petitioner] had served on his original sentence and that he was being terminated from parole. [Petitioner] was thus advised in 1976 that he was no longer on parole."

On January 20, 1979 petitioner was again arrested in Florida on a New York Division of Parole "wanted" notice. A parole violation warrant was forwarded to Florida. The specifications this time were confined to petitioner's failure to report, and his unauthorized departure from his approved residence and from the State in January, 1975. No mention was made of the alleged involvement in illegal activities with his uncle. Petitioner was detained this time in Broward County. A certified parole violation warrant was sent there on January 23, on the basis of which a Florida fugitive warrant was issued on February 7.

In view of petitioner's stable life and employment record, and his co-operation with Dade County authorities over the past several years, that agency interceded with the New York Division of Parole on petitioner's behalf in the hope of having extradition proceedings discontinued and parole supervision transferred to Florida. This request was considered by New York parole personnel. Although the New York City area supervisor recommended transfer to Florida control in a memo to the Parole Board chairman on February 21, this was overruled because petitioner's relationship with Dade County authorities had developed after petitioner had absconded to Florida.

The New York Governor's extradition warrant took some time in arriving in Florida. Petitioner was released from Broward County custody on April 24, but was rearrested after the April 20 warrant was sent to Florida on May 9. Petitioner was returned to custody in Queens on June 14, and this habeas corpus proceeding ensued *pro se.*

The issue is whether the delay of New York authorities in extraditing petitioner entitles him to discharge. This turns on the significance of the period of inaction following this State's initial interest in 1976. Special Term, finding no actual notice to New York of petitioner's Florida whereabouts, "reluctantly" dismissed the writ "on constraint of" *People ex rel. Flores v Dalsheim* (66 AD2d 381).

The question in *Flores* involved the duty of the State to execute promptly a warrant based on breach of parole, and whether lack of due diligence in such execution had rendered the warrant unenforceable by reason of staleness, waiver or violation of the "fundamental fairness doctrine embedded in the due process clause" (66 AD2d, at p 386). There the parolee had been sentenced to a maximum five-year sentence in June, 1971, was released on parole in June, 1973, and failed to meet his parole appointment in January, 1975. A warrant for his arrest was issued in April. Flores was apprehended a year and a half later, some 20 months after the maximum expiration date of his parole. His whereabouts from January, 1975 until execution of the warrant in November, 1977 were apparently no secret, Flores having lived openly as a New York City resident for that period, during which he married, filed an income tax return, received public assistance, licensed his dog, participated in publicly funded programs, and maintained public utility accounts—all under his own name.

A State cannot, consistent with the fundamental principles of justice protected by due process, compel a parolee to serve out his sentence after the State has manifested a gross disinterest in him *(State v Sheehy,* 115 NH 175). *Flores (supra),* acknowledging the impact of due process, noted that although the onus rests initially on the parolee to perform his obligations as a condition of his parole, the State also has a correlative duty to see that the conditions of parole are carried out. The sword of Damocles should not be unnecessarily dangled over the parolee's head. In balancing these obligations, the court found that the duty to afford a prompt disposition was outweighed by the fact that the parolee could at any time have walked into his Parole Board office or picked up a telephone to notify his parole officer of his whereabouts, notwithstanding the fact that he continued to reside openly at another address in the same city. The *Flores* court ruled, "We think that a parolee who fails to report and absconds from supervision cannot assert an immunity from apprehension due to delay alone by the State in finding him." *(People ex rel. Flores v Dalsheim,* 66 AD2d, at p 388.)

This conclusion is not dispositive here. New York authorities apparently knew of petitioner's whereabouts as early as the summer of 1976, nearly three years before his ultimate extradition. There is thus a valid question whether the warrant of extradition was void for staleness. As noted in *Flores,* staleness denotes little more than age, which should not, in and of itself, render a parole violation warrant void. But the *Flores* court, in dismissing the staleness argument, was addressing the inability to execute the warrant by reason of the parolee's flight. Such is not the case here. By the summer of 1976, petitioner's whereabouts, having been discovered and reported to New York authorities, no longer presented an insurmountable obstacle to his extradition (cf. *People ex rel. Spinks v Dillon,* 68 AD2d 368; *Matter of Higgins v New York State Div. of Parole,* 72 AD2d 583). Local authorities appear to have procrastinated for nearly three years before bringing him back.

Even if the three-year delay were not to render the demanding State's action stale, there is a serious question as to whether New York waived its interest in petitioner's rendition from Florida. "The doctrine of waiver presupposes, first, a knowing relinquishment of rights, and second, the authority of the parole officer who failed to pursue the violation or the

parolee to bind the State to the waiver." *(People ex rel. Flores v Dalsheim,* 66 AD2d, at p 387.)

There is no question that New York would, under normal circumstances, retain jurisdiction over a parole violator at least until the maximum expiration date of the underlying sentence (see *Birch v Anderson,* 358 F2d 520), which in this case is in 1983. Nor is it disputed that an absconding parolee, in hiding or otherwise evading service of a warrant, cannot challenge the diligence of the parole State to seek rendition. In *Flores* the court concluded that the State had "not fail[ed] in any aspect of its responsibility" because the "petitioner could have made his residence known to the Board of Parole at any time" *(People ex rel. Flores v Dalsheim,* 66 AD2d, at p 389).

Each case of waiver must be analyzed on an *ad hoc* basis (see *People ex rel. Levy v Dalsheim,* 66 AD2d 827, affd 48 NY2d 1019). The crucial event here was the 1976 notification to New York authorities that petitioner was alive and well in Dade County, Florida. Knowledge of the absconder's whereabouts might very well constitute a waiver of the parole violation *(People ex rel. Hensley v New York State Bd. of Parole,* 83 Misc 2d 269; *People ex rel. Grosso v Additon,* 185 Misc 670; *Greene v Michigan Dept. of Corrections,* 315 F2d 546), especially if the knowledge can be shown to have been actual rather than constructive *(Saunders v Michigan Dept. of Corrections,* 406 F Supp 1364), and there is affirmative evidence that the waiver was intentional *(Chapman v State of California,* 423 F2d 682, cert den 400 US 960). Such knowledge would certainly distinguish this case from *Flores,* removing any "constraining" effect that decision might have on this appeal.

Whether a Dade County detective was actually told by New York authorities in 1976 that New York had lost interest in extraditing petitioner to the control of the New York Parole Board is not clear (see *People ex rel. Hensley v New York State Bd. of Parole,* 83 Misc 2d 269, 270, *supra).* The basic question is precisely what knowledge New York parole authorities acquired in 1976, upon which they failed to act for almost three more years. The possibility exists that Queens police may have been aware of petitioner's whereabouts, but that parole authorities were not privy to this information. The question then is the effect of knowledge by the police only. While we recognize that the scope of our review is limited to

the record before us *(People ex rel. Rosenthal v Wolfson,* 48 NY2d 230), such questions cannot be determined, without a hearing, to consider whether New York had waived its right to enforce the parole violation.

The judgment of Supreme Court, Bronx County (CIOFFI, J.), entered September 27, 1979, dismissing the writ of habeas corpus, is unanimously reversed, on the law and on the facts, without costs, and the petition is granted to the extent of remanding the proceeding for a fact-finding hearing on the question of the knowledge New York parole authorities had of petitioner's whereabouts since 1976, and whether failure to act upon such knowledge constituted a waiver of parole violation.

BIRNS, J. P., MARKEWICH, LUPIANO and ROSS, JJ., concur.

Judgment, Supreme Court, Bronx County, entered on September 27, 1979, reversed, on the law and on the facts, without costs and without disbursements, and the petition granted to the extent of remanding the proceeding for a fact-finding hearing on the question of knowledge New York parole authorities had of petitioner's whereabouts since 1976, and whether failure to act upon such knowledge constituted a waiver of parole violation.